IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| SAFESCRIPT PHARMACIES, INC. | § | Case No. 04-60600 |
| SAFESCRIPT HOLDINGS, INC. | § | Case No. 04-60612 |
| MEDEX SYSTEMS, INC. | § | Case No. 04-60613 |
| PEGASUS PHARMACY, INC. | § | Case No. 04-60615 |
| SAFE MED SYSTEMS, INC. | § | Case No. 04-60616 |
| SAFESCRIPT PHARMACY #1, INC. | § | Case No. 04-60617 |
| SAFESCRIPT PHARMACY #18, INC. | § | Case No. 04-60619 |
| SAFESCRIPT PHARMACY #2, INC. | § | Case No. 04-60631 |
| SAFESCRIPT PHARMACY #36, INC. | § | Case No. 04-60633 |
| SAFESCRIPT PHARMACY #17, INC. | § | Case No. 04-60634 |
| SAFESCRIPT PHARMACY #27, INC. | § | Case No. 04-60635 |
| SAFESCRIPT PHARMACY #16, INC. | § | Case No. 04-60636 |
| SAFESCRIPT PHARMACY #13, INC. | § | Case No. 04-60637 |
| SAFESCRIPT PHARMACY #12, INC. | § | Case No. 04-60638 |
| SAFESCRIPT PHARMACY #3, INC. | § | Case No. 04-60639 |
| ADVANCED PHARMACY | § | |
| SOLUTIONS, INC. | § | Case No. 04-60651 |
| SAFESCRIPT PHARMACY #26, INC. | § | Case No. 04-61295 |
| | § | |
| | § | **JOINTLY ADMINISTERED** |
| | § | **UNDER CASE NO. 04-60600** |
| | § | |
| Debtors | § | Chapter 11 |

**EOD**
09/26/2005

**FINDINGS OF FACT AND CONCLUSIONS OF LAW PERTAINING TO
DEBTORS' MOTION TO ENFORCE PURCHASE AGREEMENT[1]**

Upon the hearing of the Motion to Enforce Purchase Agreement filed by the respective Debtors-in-Possession, Safescript Pharmacies, Inc., Safescript Holdings, Inc., MedEx Systems, Inc., Pegasus Pharmacy, Inc., Safe Med Systems, Inc., Safescript Pharmacy #1, Inc., Safescript Pharmacy #18, Inc., Safescript Pharmacy #2, Inc., Safescript Pharmacy #36, Inc., Safescript Pharmacy #17, Inc., Safescript Pharmacy #27, Inc., Safescript Pharmacy #16, Inc., Safescript Pharmacy #13, Inc., Safescript Pharmacy

---

[1] These findings and conclusions are not designated for publication and shall not considered as precedent, except under the respective doctrines of claim preclusion, issue preclusion, the law of the case or as to other applicable evidentiary doctrines.

#12, Inc., Safescript Pharmacy #3, Inc., Advanced Pharmacy Solutions, Inc., and Safescript Pharmacy #26, Inc. (collectively referenced as the "Debtors") in the above-referenced case, the Court issues the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, as incorporated into contested matters in bankruptcy cases by Fed. R. Bankr. P. 7052 and 9014.[2]

1. This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §1334 and 28 U.S.C. §157(a). The Court has authority to enter a final order in this contested matter since it constitutes a core proceeding as contemplated by 28 U.S.C. §157(b)(2)(A), (D), (N), and (O).

2. Each of the Debtors filed a voluntary petition for relief under Chapter 11 and they operated their respective pharmacy-related businesses as debtors-in-possession.

3. On April 16, 2004, the Debtors obtained final court authority to obtain post-petition credit (the "DIP Loan") from SS Acquisitions, L.L.C. ("SSA").

4. ¶ 2.3 of the Financing Agreement[3] executed by and among the parties established, *inter alia*, the repayment date for the DIP Loan. It provided that:

   > **Repayment Date**. Unless terminated earlier pursuant to the terms of this Financing Agreement or the Revolving Loan Promissory Note, the principal amount of the Revolving Loan, *together with all accrued and unpaid interest and other charges* due hereunder or under the Revolving Loan Promissory Note, shall be repaid to the holder of the Revolving Loan Promissory Note on the earliest of: (a) the Effective Date, (b) the effective date of the Plan of Reorganization, (c) immediately upon the closing of a 363 Sale, or (d) the occurrence of an Event of Default hereunder or under any other Loan Document. (emphasis added).

5. However, the Financing Agreement also allowed for the pre-payment of any portion of the DIP Loan by the Debtors under certain specified conditions.

---

[2] Items identified herein as findings of fact may also be construed to be conclusions of law and are adopted as such. Items identified herein as conclusions of law may also be construed to be findings of fact and are adopted as such. The Court reserves the right to make additional findings and conclusions as necessary or as may be requested by any party.

[3] Debtors' Ex. 1.

6. Specifically, ¶ 2.5(b) of the Financing Agreement provided that:

> The Company [Debtors] may prepay at any time, at its option, *in whole or in part*, the Revolving Loan, provided that the Company shall have first paid (i) all fees, costs, expenses, or other amounts payable hereunder, if any, and (ii) all accrued interest on the principal so pre-paid to the date of such pre-payment, and such pre-payment shall be in increments of $100,000 (emphasis added).

7. On August 12, 2004, after completing a court-authorized purchaser solicitation period, the Debtors obtained court authority to sell its business operations to SSA and an Asset Purchase Agreement[4] was executed by and among the parties.

8. ¶ 3.1 of the Asset Purchase Agreement defined the components of the purchase price for the Debtors' assets and, in the portion most relevant to this dispute, ¶3.1(b) of the Asset Purchase Agreement provided that SSA as Purchaser would pay to the Debtors as Sellers:

> (b) $500,000.00 in cash payable to Seller, less the aggregate amount of all fees, interest and other amounts then due under the DIP Loan.

9. It was in the best interests of the creditors of the bankruptcy estate for the sale to SSA to close as rapidly as possible in order to reduce the amount of accrued interest and to foreclose the possible increase of professional fees incurred by SSA in its capacity as the DIP Lender. The parties tentatively agreed to close the sales transaction before the end of 2004.

10. However, there arose a substantial dispute between the Debtors and SSA regarding the reasonableness of certain fees and expenses, including attorneys' fees, which SSA asserted was due and owing to it in its capacity as the DIP Lender. No resolution of that dispute had been accomplished as of December 29, 2004.

11. There was also a substantial dispute between the Debtors and SSA regarding the total amount of interest which had accrued on the DIP Loan payable to SSA. No resolution of that dispute had been accomplished as of December 29, 2004.

12. On November 24, 2004, the Debtors forwarded an email inquiry to Mr. Antonoff,

---

[4] Debtors' Ex. 2.

the counsel for SSA, regarding the calculation of anticipated fees and closing costs relating to the closing of the Asset Purchase Agreement.

13. That inquiry was not answered until Wednesday, December 29, 2004, when a proposed closing statement was forwarded by SSA to the Debtors.[5]

14. The tentative closing statement as initially presented by SSA suggested distributions of the proposed sale proceeds to SSA as DIP Lender in the following amounts:

    accrued interest:   $220,091.67
    fees/expenses:      $ 55,901.50
    closing fee:        $250,000.00

15. The net result, as contemplated by SSA in its initial closing statement, was that the sale of the assets by the Debtors to SSA as Purchaser, contemplating the satisfaction of all indebtedness to SSA as the DIP Lender, would result in the Debtors still owing the sum of approximately $26,000.00 to SSA, notwithstanding the sale of all of the Debtors' assets.

16. Not surprisingly, the position taken by SSA as Purchaser that the Debtors would be selling their various business enterprises to it and thereafter still owe approximately $26,000 in DIP lending obligations to SSA, resulting in no net benefit to the bankruptcy estate, was summarily rejected by the Debtors.

17. In an immediate response to the SSA proposed closing statement, the Debtors challenged the assertion that the Debtors were contractually obligated to pay the DIP Loan at closing and countered that the amount due and owing to the Debtors by SSA as Purchaser was the sum of $500,000.00.[6]

18. The SSA closing analysis and the Debtors' response thereto triggered a crisis-type environment, given that the proposed closing was less than 48 hours away.

19. An intense series of communications developed in the late afternoon and early evening hours of Wednesday, December 29, 2004, by and among the counsel for SSA, the Debtors, and the Committee of Unsecured Creditors in order to try to resolve outstanding disputes on the amount of fees and interest which SSA would be allowed to deduct as Purchaser from the $500,000 cash portion of the purchase

---

[5] Debtors' Ex. 8.

[6] Debtors' Ex. 6.

price under ¶3.1(b) of the Asset Purchase Agreement.

20. In the negotiations, the Debtors were insistent that the closing of any sale of the Debtors' assets result in a net benefit to the bankruptcy estate of at least $100,000.00.

21. At the conclusion of the negotiations on December 29, the Debtors and SSA reached a compromise. The compromise was reduced to writing by SSA and was executed by representatives of SSA, the Debtors, and the Committee (the "Compromise Agreement").[7]

22. The Compromise Agreement stated:

   A. Allocation of Cash Portion of Purchase Price

   The aggregate amount of all fees, interest and other amounts due at Closing under the DIP Loan shall be $400,000.00 as follows:

   1. Interest under Section 6.1 of the DIP Loan accrued through and including August 10, 2004, in an aggregate amount equal to $100,924.63;

   2. Out-of-Pocket Expenses under Section 6.3 of the DIP Loan in an aggregate amount equal to $49,075.37, comprising fees and expenses of Lender's counsel as reduced pursuant to agreements between Buyer and Seller to (a) Greenburg Traurig in the amount of $39,919.05 and (b) Ireland, Carroll & Kelley in the amount of $9,156.32; and

   3. Closing Fee under Section 6.5 of the DIP Loan in the amount of $250,000.

   The balance of any amounts that may be due for interest accrued after August 10, 2004, Out-of-Pocket Expenses, fees or amounts of any type whatsoever under the DIP Loan other

---

[7] Debtors' Ex. 7. The Committee agreed to the Compromise Agreement with a slight modification pertaining to its rights to seek a conversion or dismissal of the Chapter 11 case depending on developing circumstances.

    than those specifically set forth in items 1, 2 and 3 above shall be forgiven, forfeited and otherwise waived by SS Acquisitions, LLC as against the Debtors' bankruptcy estates. As a result of the foregoing agreements, the net cash payable to the Seller at Closing will be $100,000.

23. The Compromise Agreement ended with the following provision:

    Nothing contained herein shall be deemed to be a waiver of any rights or remedies the parties may have other than as specifically set forth herein, all of which other rights are expressly reserved.

24. The Compromise Agreement reduced the Debtors' liabilities under the DIP Loan from the $525,993.17 asserted by SSA to an agreed figure of $400,000.00.

25. The parties agree that the waiver of the pre-payment rights held by the Debtors under ¶ 2.5(b) of the Financing Agreement was never specifically discussed at any time during the December 29th negotiations.[8]

26. The attorneys for the parties agree that none of them knew, at the time of the execution of the Compromise Agreement, whether the Debtors actually possessed the financial ability to exercise their pre-payment option under ¶ 2.3 of the Financing Agreement.[9]

27. The financial calculations expressed in the Compromise Agreement would have been accurate based upon an assumption that the Debtors could not, or would not,

---

[8] Mr. Antonoff testified that:

  Q (by Mr. Sheehy): "In our negotiation, was there ever any discussion or dialogue with any of the parties in which there was proposed or which was stated there would [be] a waiver of the Debtors' right to prepay the DIP loan?"

  A (by Mr. Antonoff): "Prepayment of the DIP Loan was never discussed in any manner at any time."

Antonoff deposition, page 22, lines 16-21.

[9] It is clear from the evidence, however, that while SSA did not believe that the Debtors had any such ability, the Debtors and the Committee were still hopeful.

exercise their pre-payment option under ¶ 2.3 of the Financing Agreement prior to closing.

28. Immediately following the execution of the Compromise Agreement, the Debtors' counsel confirmed the availability of funds, generated from the general revenue of the Debtors,[10] which could be tendered by the Debtors as a pre-payment of the agreed amount of accrued interest and fees under the DIP Loan as resolved by the Compromise Agreement.

29. Immediately upon confirming the availability of the Debtors' funds, the Debtors notified SSA, via the email correspondence to its attorney, that they were electing to exercise a portion of the pre-payment option provided under ¶ 2.3 of the Financing Agreement.[11]

30. The next day, on Thursday, December 30, 2004, the Debtors tendered two cashier's checks to Jeff Poliakoff, the on-site management and transition liaison for SSA: one check in the stated amount of $100,924.63, an amount equivalent to the compromised sum for accrued interest under the Letter Agreement; and a second check in the stated amount of $49,075.37 which was equivalent to the compromised sum for Out-of-Pocket Expenses under the Letter Agreement.

31. SSA, in its capacity as Purchaser, never responded to the Debtors' notice that they intended to exercise a portion of the pre-payment option under ¶ 2.5(b) of the Financing Agreement.

---

[10] John Hurley, the chief operating officer of the Debtors, testified that:

> Q (by Mr. Sheehy): "I'm asking you now, do you know where the company came up with the $150,000? Do you have the knowledge as to the source of that?"
>
> A (by Mr. Hurley): "Absolutely, yes, sir, I do."
>
> Q (by Mr. Sheehy): "Was it from the general revenue of the company?"
>
> A (by Mr. Hurley): "Yes, sir, it was."

Hurley deposition, page 6, lines 23-25 and page 7, lines 1-4. Such testimony was not contradicted by SSA.

[11] Debtors' Ex. 5.

32. SSA, in its capacity as Purchaser, never objected to the Debtors' actual exercise of the pre-payment option under ¶ 2.5(b) of the Financing Agreement prior to closing.

33. SSA, in its capacity as the DIP Lender, accepted the pre-payment of $150,000.00 from the Debtors under the terms of ¶ 2.5(b) of the Financing Agreement and never returned any portion of those payments to the Debtors under the assertion that the pre-payment option had been extinguished by the Compromise Agreement and that, therefore, the payments were improper.

34. Closing on the sale contemplated by the Asset Purchase Agreement occurred on Friday, December 31, 2004.

35. Notwithstanding its acceptance as the DIP Lender of the $150,000.00 as a pre-payment under the provisions of ¶ 2.5(b) of the Financing Agreement, SSA, in its capacity as Purchaser at the closing, tendered net proceeds of only $100,000.00 to the Debtors, which the Debtors have refused to accept as the full and final payment due and owing to them under the provisions of the Asset Purchase Agreement.

36. Upon SSA's refusal to tender additional funds to the Debtors in fulfillment of its obligations as Purchaser under the Asset Purchase Agreement, the Debtors brought the current "Motion to Enforce Purchase Agreement" to obtain a court order compelling SSA as Purchaser to satisfy fully its obligations under the Asset Purchase Agreement by: (1) tendering an additional $150,000.00 to the Debtors; and (2) removing all conditions imposed upon the $100,000.00 previously tendered to the Debtors.

37. SSA's assertion that the Compromise Agreement was intended to be a comprehensive agreement which froze all rights of the parties prior to closing, thereby limiting the Debtors to the receipt of $100,000,00 from the Asset Purchase Agreement, is not supported by the evidence.

38. The fact that any fees, interest and other amounts due under the DIP Loan at the time of closing would reduce the purchase price owed by SSA under ¶ 3.1 of the Asset Purchase Agreement did not affect the Debtors' right to exercise their pre-payment option under ¶ 2.3 of the Financing Agreement prior to closing.

39. Though SSA clearly expected that the sum of $100,000.00 would be sufficient to close the sale under the Asset Purchase Agreement, the Compromise Agreement did not mandate such a result.

40. The resolution of the disputed amount of accrued interest and the disputed amount of attorneys' fees properly payable to SSA as the DIP Lender were the only matters compromised and determined under the Compromise Agreement.

41. The Compromise Agreement did not purport to extinguish, nor did it extinguish, the Debtors' right to exercise the pre-payment option provided under ¶ 2.5(b) of the Financing Agreement.

42. The Debtors' execution of the Compromise Agreement did not constitute any acceptance of, nor did it denote any willingness by the Debtors to accept, the sum of $100,000.00 as the proper amount to be paid by SSA as the Purchaser under the Asset Purchase Agreement.

43. The terminology "due at Closing" as utilized in the Compromise Agreement did not definitively fix the final accounting to be utilized at closing.

44. The Debtors' right to pre-pay all or any portion of the DIP Loan under the provisions of ¶ 2.5(b) of the Financing Agreement was properly exercised by the Debtors before the Closing Date.

45. The Debtors' payment of the accrued fees and interest conformed to the payment application scheme which they were contractually bound to follow under ¶ 2.5(b) of the Financing Agreement.

46. The utilization of the cash by the Debtors in the exercise of their pre-payment options under ¶ 2.5(b) of the Financing Agreement did not constitute an unauthorized use of cash collateral in violation of the rights of SSA as the DIP Lender under the Financing Agreement.

47. The utilization of the cash by the Debtors in the exercise of their pre-payment options under ¶ 2.5(b) of the Financing Agreement did not constitute an improper disposition of the Purchased Assets in violation of the rights of SSA as the Purchaser under the Asset Purchase Agreement.

48. The utilization of the cash by the Debtors in the exercise of their pre-payment options under ¶ 2.5(b) of the Financing Agreement did not constitute an improper disposition of funds in violation of the rights of SSA under the Management Services Agreement as supplemented.[12]

---

[12] Debtors' Ex. 3 and 4.

49. SSA essentially claims that it was a victim of fraudulent inducement or mistake. It contends that it should not be subject to the Debtors' enforcement motion because if the Debtors had disclosed an intention or an ability to exercise the pre-payment option regarding the DIP financing, SSA would not have compromised its rights in the manner reflected in the Compromise Agreement.[13]

50. SSA was not a victim of fraudulent inducement in the execution of the Compromise Agreement.

51. As stated in *Amouri v. Southwest Toyota, Inc.*, 20 S.W.3d 165, 168-69 (Tex. App. — Texarkana 2000, pet. denied):

> Fraudulent inducement is a type of fraud claim that shares the same elements as a simple fraud claim. *DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670, 688 (Tex. 1990); *Carr v. Christie,* 970 S.W.2d 620, 624 (Tex. App. — Austin 1998, pet. denied). Thus, to prove fraudulent inducement, Amouri had to show (1) that Southwest made a material misrepresentation that was false, (2) that it was either known to be false when made or was asserted without knowledge of its truth, and (3) that it was intended to be acted on, was relied

---

[13] Mr. Antonoff testified that:

> "I believe that if the Debtors were planning to pre-pay the DIP loan, even if they had sufficient funds to do so, *which they did not*, Mr. Sheehy would have notified me during the discussions leading to the Letter [Compromise] Agreement. He did not. Mr. Monsour also did not at any time say anything about prepaying the DIP loan."

Antonoff deposition, page 12, lines 14-21 (emphasis added).

> "If it is true that Debtors intend[ed] to pay interest and expenses before the Closing Date, neither Mr. Sheehy, Mr. Monsour nor any other person disclosed that to me or any other representative of SS Acquisitions before all the parties signed the Letter [Compromise] Agreement, notwithstanding that the Letter [Compromise] Agreement contemplates that interest and expenses would be paid at closing. *If such intentions had been disclosed, I most likely would not have recommended that SS Acquisitions agree to the terms of the Letter [Compromise] Agreement.*"

Antonoff deposition, page 13, line 19 through page 14, line 4 (emphasis added).

> on, and caused injury. *Formosa Plastics Corp. USA v. Presidio Engineers and Contractors, Inc.,* 960 S.W.2d 41, 47 (Tex. 1998); *DeSantis v. Wackenhut Corp.,* 793 S.W.2d at 688-89.

52.  There is no evidence presented by SSA of any actual material misrepresentation made by the Debtors or the Committee during the negotiation of the Compromise Agreement.

53.  Even though silence can under proper circumstances be equivalent to a false representation where circumstances impose a duty to speak and one deliberately remains silent, *Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 435 (Tex. 1986), *Smith v. National Resort Communities, Inc.*, 585 S.W.2d 655, 658 (Tex. 1979), there was no duty imposed upon the Debtors under these circumstances to remind a sophisticated entity such as SSA of the nature or scope of pre-existing contractual rights held by each party arising from the earlier agreements or to highlight the fact that the Compromise Agreement negotiated between them did not constitute an alteration or rescission of those rights.

54.  In fact, such an argument is specifically precluded by the final paragraph of the Compromise Agreement (drafted by SSA) which specifically provided that:

> Nothing contained herein shall be deemed a waiver of any rights or remedies the parties may have other than as specifically set forth herein, all of which other rights are expressly reserved.

55.  The parties negotiated the Compromise Agreement with full knowledge of all contractual rights which each side already possessed under the Financing Agreement and the Asset Purchase Agreement.

56.  There is no evidence of mutual mistake and no evidence of any circumstance which could provide SSA a remedy for a unilateral mistake regarding the Debtors' right or ability to make a partial pre-payment prior to closing.

57.  In fact, SSA bears responsibility for any mistake which it might have made regarding the effect of the Compromise Agreement.

58.  Under § 154 of the Restatement (Second) of Contracts, a party bears the risk of mistake when it knowingly treats its limited knowledge of the facts surrounding the mistake as sufficient. *Cherry v. McCall*, 138 S.W.3d 35, 40 (Tex. App. — San

-11-

Antonio 2004, pet. denied); RESTATEMENT (SECOND) OF CONTRACTS § 154(a) & (b) (1981).

59. SSA possessed the ability to review and to negotiate for the termination of all pre-existing pre-payment rights under the Financing Agreement. It did not do so.

60. SSA also had the capability of confirming its belief regarding the Debtors' inability to exercise any pre-existing rights by verifying the Debtors' cash status through its on-site manager prior to its execution of the Compromise Agreement. It did not do so.

61. Because the Debtors possessed, and properly exercised, the right to pre-pay portions of the DIP Loan after the execution of the Compromise Agreement, the Court concludes that the Debtors' Motion must be granted to the extent that SSA, in fulfillment of its obligations as Purchaser under the terms of the Asset Purchase Agreement, must tender to the Debtors an additional $150,000.00 and all conditions imposed upon the $100,000.00 previously tendered to the Debtors by SSA are hereby removed.

62. The Debtors' request for an award of attorneys' fees is denied because no evidence establishing the fulfillment of all prerequisites and the reasonableness of any fees incurred was tendered at the hearing.

63. A separate order shall be entered which is consistent with these findings and conclusions.

Signed on 9/26/2005

THE HONORABLE BILL PARKER
CHIEF UNITED STATES BANKRUPTCY JUDGE